# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LIVE WELL FINANCIAL, INC.,<br><br>Debtor. | Chapter 7<br><br>Case No. 19-11317 (LSS) |
| DAVID W. CARICKHOFF, as Chapter 7 Trustee of LIVE WELL FINANCIAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>WEDBUSH SECURITIES, INC.,<br><br>and<br><br>JOHN DOES 1-10,<br><br>Defendants. | Adv. Pro. No. 21-50989 (LSS)<br><br>**Re: Docket No. 13** |

## OPINION

On June 10, 2019, creditors filed an involuntary chapter 7 petition against Live Well Financial, Inc. ("Live Well or Debtor").[1] On July 1, 2019, an Order for Relief was entered and David W. Carickhoff was appointed as the chapter 7 trustee ("Trustee"). In this adversary proceeding, Trustee seeks to avoid and recover certain allegedly fraudulent transfers made by Debtor to Wedbush Securities, Inc. ("Wedbush") on account of an

---

[1] All references to the docket of the above-captioned adversary proceeding will be cited as "A.P." References to the docket of the main bankruptcy case will be cited as "D.I."

antecedent debt.[2] Wedbush filed its Motion to Dismiss[3] challenging the fraudulent intent of the transfers. For the reasons set forth below, the Motion to Dismiss is denied.

**Background**[4]

Live Well, founded in 2005, was a private financial services company participating in the reverse mortgages market. In 2014, Live Well decided to expand its business to invest in Home Equity Conversion Mortgage, Interest Only (HECM IO) bond strips. These bonds are reverse mortgage-backed securities that entitle the bondholder to receive a portion of interest payments made on the underlying reverse mortgage.

To finance the acquisition of these bonds, Live Well entered into repurchase agreements with various lenders, including Wedbush, where the lender would buy the securities from the seller (Live Well) at a discounted price (80-90% of the then-current value of the bonds) and Live Well would agree to repurchase the bonds at the total purchase price plus interest and fees. If the prices of the bonds went up, Live Well could borrow more against the bond, but if the prices went down, Live Well was obligated to post margin (make a payment) to the lender proportional to the decrease in value of the bonds.

There is a limited market for this type of bond trading, making the value of the bonds difficult to calculate. Therefore, Live Well engaged Interactive Data Pricing and Reference Data LLC ("IDC") to publish prices for the Live Well bonds. In November 2014, Live

---

[2] A.P. 1 (Complaint by David W. Carickhoff against Wedbush Securities, Inc.) ("Complaint").

[3] A.P. 13 (Wedbush Securities, Inc.'s Motion to Dismiss Adversary Complaint).

[4] As required on a motion to dismiss the facts recited herein are taken from the Complaint. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). A court is not required to make findings of fact or conclusions of law on a motion to dismiss under Fed. R. Civ. P. 12, made applicable by Fed. R. Bankr. P. 7012, and I make none. *See* Fed. R. Civ. P. 52(a)(3), made applicable by Fed. R. Bankr. P. 7052.

Well purchased $46 million worth of bonds funded by repurchase agreements with three different lenders, including Wedbush. However, fluctuations in the bond values posted by IDC created a liquidity crisis for Live Well. As the prices of the bonds went down, the lenders requested that Live Well make the required margin payments. As a result, Michael Hild, the founder, chairman and CEO of Live Well, tasked Charles Stumberger, the executive vice president of Live Well, with solving the problem.

On February 12, 2015, Stumberger informed Hild that the problem was solved—IDC would no longer independently value the bonds but instead publish prices supplied by Live Well "verbatim." Thereafter, Live Well began to inflate bond prices and draw on its increased credit from the lenders. From September 2015 to December 2016 Live Well increased the amount of its bond-related borrowings from $124 million to over $430 million.

By December 2016, Wedbush had extended approximately $225 million in repurchase loans to Live Well. In January 2017, Wedbush began to express concerns about the IDC valuations of the bonds, requested the name of a broker dealer that could verify the market prices provided by IDC, and sought to reduce its line of credit by requiring Live Well to repurchase some of the bonds. Because the bond prices were grossly inflated, Live Well could not simply liquidate the bonds. Instead, Live Well needed time to find new lenders to pay down its existing credit lines with Wedbush. Wedbush allowed this additional time and in exchange chose to exercise certain remedies such as, increasing the "haircut" it applied to the purchase price of the bonds from 10% to 15%, placing the Live Well bonds on open (meaning Wedbush could require Live Well to repurchase any or all of the bonds at any time) and decreasing Live Well's line of credit from $225 million to $125 million. Trustee alleges (upon information and belief) that Wedbush reduced Live Well's

line of credit because the Securities and Exchange Commission contacted Wedbush in its investigation of Live Well which began in March 2017.

To pay off Wedbush, Live Well had to find more borrowing capacity. In February and March of 2017, Live Well began moving Wedbush bonds to two of its existing lenders, ICBC and Nomura, and entered into a new repo agreement with Flagstar Bank FSB.[5] Live Well repurchased Wedbush bonds by using proceeds it received from these sources. In the summer and fall of 2017, Live Well continued to repurchase Wedbush bonds, including with funds from another repo lender, Mirae Asset Securities (USA) Inc. From June 10, 2017 (two years prior to the bankruptcy filing) to the end of October 2017, Live Well made the following transfers to Wedbush to repurchase bonds and pay interest and fees under Wedbush's repurchase agreements:

| Date | Amount |
| --- | --- |
| 06/29/2017 | $18,718.33 |
| 07/07/2017 | $37,411.19 |
| 07/07/2017 | $123,471.91 |
| 07/21/2017 | $8,577.19 |
| 07/21/2017 | $549,000.00 |
| 07/31/2017 | $20,420.00 |
| 08/03/2017 | $135,990.63 |
| 08/03/2017 | $1,476,000.00 |
| 08/22/2017 | $20,000,000.00 |
| 08/31/2017 | $10,210,000.00 |
| 09/05/2017 | $19,342.28 |
| 09/05/2017 | $6,179,000.00 |
| 09/21/2017 | $8,815.63 |
| 09/21/2017 | $400,000.00 |
| 09/27/2017 | $214,000.00 |

---

[5] Just moving bonds to Nomura would not generate sufficient funds to fully pay off or repurchase the bonds from Wedbush because Nomura did not rely on IDC's valuation of the bonds. The bond prices submitted to IDC by Live Well were 45.7% higher than those used by Nomura.

| | |
|---|---|
| 09/27/2017 | $35,272,000.00 |
| 09/27/2017 | $59,947.59 |
| 09/29/2017 | $1,773.78 |
| 09/29/2017 | $7,982,000.00 |
| 10/05/2017 | $29,819.55 |
| 10/05/2017 | $33,547,000.00 |
| 10/20/2017 | $7,856.18 |
| 10/20/2017 | $4,150,000.00 |
| Total: | $120,451,144.26 |

Trustee alleges these transfers were made with the intent to conceal a Ponzi-like scheme. Live Well used new loans to pay off old ones, increasing Live Well's liabilities beyond the value of the underlying assets, making it inevitable that the scheme would collapse, and creditors would be harmed. These payments, which prolonged the scheme, worsened Live Well's financial condition and increased the inevitable shortfall of assets available for Live Well's victims and creditors when the scheme finally collapsed.

On May 3, 2019, Live Well wound down its operations and terminated all of its employees. Michael Hild (founder, chairman and CEO), Eric Rohr (CFO), and Charles Stumberger (executive vice president) (together the "Criminal Insiders") pled guilty or were found guilty for their participation in the bond price-fixing scheme.

**Procedural History**

On June 10, 2019, three of Live Well's lenders filed an involuntary chapter 7 petition against Live Well.

On June 28, 2021, Trustee filed the Complaint, in two counts, alleging the transfers made to Wedbush within the two-year period are avoidable as actual fraudulent transfers under § 548(a)(1)(A) and therefore recoverable pursuant to 11 U.S.C. § 550. Thereafter,

5

Wedbush filed its Motion to Dismiss and Opening Brief,[6] Trustee filed his Answering Brief[7] and Wedbush filed its Reply Brief.[8] Briefing is complete,[9] and this matter is ripe for decision.

**Jurisdiction**

Subject matter jurisdiction exists over this Adversary Proceeding pursuant to § 1334(b). "Adversary proceedings seeking to avoid fraudulent conveyances and preferences are statutorily core matters."[10] As to the entry of final orders in this Adversary Proceeding, the Trustee consents.[11] Wedbush "consents to the entry of final orders or judgments by the Court in connection with the Motion [to Dismiss] but reserves its right to seek a jury trial before an Article III judge."[12]

**Legal Standard**

When considering a motion to dismiss under Rule 12(b)(6) the court will separate the factual and legal elements. Taking all well-pled facts as true and construing them in the light most favorable to the non-moving party, the court must determine whether there exists a "plausible claim for relief."[13] A plausible claim for relief is stated where the factual

---

[6] A.P. 14 (Wedbush Securities, Inc.'s Memorandum in Support of its Motion to Dismiss).

[7] A.P. 17 (Trustee's Response in Opposition to Motion to Dismiss of Wedbush Securities, Inc.).

[8] A.P. 18 (Reply in Support of Wedbush Securities, Inc.'s Motion to Dismiss).

[9] A.P. 20 (Notice of Completion of Briefing).

[10] *In re F-Squared Inv. Mgmt., LLC*, Case No. 15-11469 (LSS), 2019 WL 4261168, at *6 (Bankr. D. Del. Sep. 6, 2019).

[11] Compl. ¶ 16

[12] Motion to Dismiss at 2.

[13] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

allegations create a "reasonable inference that the defendant is liable for the misconduct alleged."[14]

**Discussion**

**I. Actual Fraudulent Conveyance**

In Count I, Trustee seeks to avoid twenty-three transfers made by Live Well to Wedbush pursuant to § 548(a)(1)(A). To avoid the transfers, Trustee must show that the transfers were made within the two years prior to the bankruptcy filing and with the actual intent to hinder, delay, or defraud creditors.[15] It is the intent of the transferor, not the transferee, that must be established.[16]

**a. Fraudulent Intent**

Fraudulent transfer claims must be pled with specificity pursuant to Federal Rule of Civil Procedure 9(b) made applicable by Federal Rule of Bankruptcy Procedure 7009. Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[17] "Allegations of 'date, place or time' fulfill the requirement to plead the

---

[14] *Merck Sharp & Dohme Corp. v. Teva Pharm. USA, Inc.*, C.A. No. 14-874-SLR-SRF, 2015 WL 4036951, at *5 (D. Del. July 1, 2015) (citing *Iqbal*, 556 U.S. at 663; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

[15] *In re Millennium Lab Holdings II, LLC*, Case No. 15-12284 (LSS), Adv. No. 17-51840 (LSS), 2019 WL 1005657, at *2 (Bankr. D. Del. Feb. 28, 2019) (citing 11 U.S.C. § 548(a)(1)(A); *Liquidation Trust of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537, 550 (D. Del. 2005)).

[16] *Id.* (citing *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006) (citation omitted)).

[17] Fed. R. Civ. P. 9(b).

circumstances constituting fraud or mistake with particularity . . . ."[18] However, plaintiffs can use "alternative means" to substantiate and make their allegations of fraud more precise.[19] In its analysis, the court will look to the totality of the circumstances and "may consider factors other than badges of fraud" to determine whether fraudulent intent has been adequately pled.[20]

Wedbush argues Trustee improperly relies on the Ponzi scheme presumption to establish intent and otherwise does not satisfy the heightened pleading standards of Rule 9(b). Wedbush contends Trustee must allege intent using badges of fraud for each individual transfer and the only intent alleged by Trustee relates to the intent to defraud new lenders, not in making the transfers.[21]

Trustee counters that Debtor's bond fraud scheme may not meet the technical definition of a Ponzi scheme, but it exhibits the same material hallmarks necessary to infer the requisite fraudulent intent.[22] Although not necessary to establish fraudulent intent, Trustee argues, it has sufficiently pled badges of fraud.[23]

---

[18] *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (quoting *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

[19] *Id.*

[20] *SB Liquidation Trust v. Preferred Bank (In re Syntax-Brillian Corp.)*, Case No. 08-11407 (BLS), Adv. No. 10-51389 (BLS), 2016 WL 1165634, at *5 (Bankr. D. Del. Feb. 8, 2016) (citations omitted); *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (citing *In re Tribune Co.*, 464 B.R. 126, 162 (Bankr. D. Del. 2011)).

[21] Opening Br. at 12.

[22] Answering Br. at 11.

[23] Answering Br. at 15–18.

Wedbush's argument suggests pleading the badges of fraud is necessary for the court to infer fraudulent intent. It is not. Identifying badges of fraud is just one substitute for direct evidence.[24] And a court may consider other factors when analyzing a debtor's intent.[25]

Trustee makes multiple allegations relating to Debtor's intent in making the transfers to Wedbush:

- The Criminal Insiders knew that if Wedbush checked the bond prices with any reputable broker dealer it would discover the bonds were grossly overvalued and Live Well could not cover the amounts owed to Wedbush. Compl. ¶ 69.

- Defaulting under the Wedbush repurchase agreement would have had disastrous results for Live Well, creating defaults under all of Live Well's repurchase agreements and likely ending the company and exposing the fraud. Thus, the Criminal Insiders were desperate to avoid that outcome and lobbied Wedbush for more time to find/create additional borrowing capacity with other lenders. Compl. ¶ 71.

- Live Well used new repurchase loans based on the fraudulently inflated values of the bonds to generate the funds necessary to pay off its older lenders in furtherance of, and in an effort to conceal, their fraud with knowledge that creditors would inevitably be harmed when the scheme eventually collapsed. Compl. ¶ 93.

- Live Well's bond trading business had turned into a *de facto* Ponzi scheme that required finding new victims to pay off the debts owed to earlier victims. Live well could not pay its obligations under its repurchase agreements by selling the bonds at market prices, and any failure by Live Well to secure the financing necessary to meet a repurchase demand from one of its lenders would, and inevitably did, result in the entire scheme collapsing. Compl. ¶ 116.

In addition to the allegations surrounding the transfers, additional circumstances lend support to Trustee's allegations of fraudulent intent in connection with the transfers to

---

[24] *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3.

[25] *In re Tribune Co.*, 464 B.R. at 162 (citing *Official Comm. of Unsecured Creditors of Fedders N. Am. Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009)).

Wedbush. Trustee alleges that if Live Well defaulted under the repurchase agreement with Wedbush, it would be a default under all the other repurchase agreements. It follows, Live Well did not want its scheme to be discovered and in order to prevent exposure, it worked with and paid off suspecting lenders to prevent a default. It is also plausible that Live Well wanted to continue perpetuating the fraud, raising over $53 million between January and March of 2017.[26] While most, if not all, of that money may have been used to pay Wedbush, the fraud was not uncovered, and Live Well did not wind down, until May 3, 2019.

Wedbush relies on *In re Sharp Int'l Corp.*, in which the Second Circuit affirmed the dismissal of a fraudulent conveyance claim holding that claim failed for the independent reason that "[t]he fraud alleged in the complaint relate[d] to the manner in which Sharp obtained new funding . . . not Sharp's subsequent payment of part of the proceeds to [defendant]."[27] Wedbush contends Trustee's allegations do the same as he focuses on the intent of the Criminal Insiders in defrauding new lenders rather than Debtor's intent in repaying Wedbush.[28] Trustee distinguishes *Sharp* for two reasons. First, Trustee cites cases for the proposition that *Sharp* does not apply where the complaint alleges the transfers were

---

[26] Compl. ¶ 77.

[27] Opening Br. at 11–12; *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005).

[28] Opening Br. at 12.

10

made in furtherance of the fraudulent scheme,[29] which Trustee did here.[30] Second, Trustee notes the lender in *Sharp* was a secured creditor and asserts Wedbush is not.[31] In reply, Wedbush reiterates its argument that the allegations of fraud only relate to Debtor's intent in obtaining the funds not in making the transfers.[32] With respect to the secured creditor argument, Wedbush contends that the Second Circuit did not rely on this status for its holding.[33]

I agree with the courts that have interpreted *Sharp* to be, at bottom, a case turning on insufficient pleading. Unlike in *Sharp*, here Trustee pled that Live Well's transfers to repurchase the HECM IO bond strips from Wedbush were made with the requisite intent to hinder, delay, or defraud creditors. Reading the Complaint in its entirety leads to the reasonable inferences that Live Well paid Wedbush in order to continue the fraudulent bond scheme. Had it not, and Live Well defaulted, the scheme would have unraveled. Plaintiff sufficiently ties Debtor's fraudulent intent to the specific transfers at issue.[34]

---

[29] Answering Br. at 20 (citing *e.g., Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 302 (S.D.N.Y. 2010) (finding *Sharp* "turn[ed] on a straightforward pleading issue" and provided no basis for dismissal where the debtors "specifically pled and demonstrated that the redemption payments hindered, delayed, and defrauded Bayou's creditors, by *inter alia*, forestalling disclosure of the fraudulent scheme.") and *Zazzali v. AFA Fin. Grp., LLC*, No. 10-54524 PJW, 2012 WL 4903593, at *9 (Bankr. D. Del. Aug. 28, 2012) (distinguishing *Sharp* and finding the trustee sufficiently alleged that the transfers were made in furtherance of the fraudulent scheme)).

[30] Answering Br. at 20 (citing Compl. ¶¶ 1, 11, 93, 115–116).

[31] *Id.* at 21.

[32] Reply Br. at 6.

[33] *Id.*

[34] Whether Wedbush is a secured creditor is a question of fact not before me at this time. The Complaint alleges that the bonds were owned by Wedbush subject to the contractual obligation of Live Well to repurchase at a future date. Wedbush points to a complaint filed against Hild in which Trustee refers to Live Well's obligations to repo lenders as "bond secured debt." Reply Br. at 7

11

### b. Section 548(c) Defense

Wedbush further argues that the Complaint should be dismissed, and leave to amend denied, because the allegations set forth in the Complaint prove Wedbush's complete defense under § 548(c). Section 548(c) establishes an affirmative defense by allowing a transferee who "takes for value and in good faith" to retain the interest transferred. A complaint will only be dismissed where the defendant's good faith is apparent on the face of the complaint.[35]

Wedbush contends the facts alleged in the Complaint are self-defeating, conceding that Wedbush took the transfers in good faith.[36] In support, Wedbush points to allegations in the Complaint relating to another repo lender, Mirae, which Trustee alleges "did not know, nor could it have known, that asset value and financial results reported in those financial statements were based upon bond prices that the Criminal Insiders had fraudulently inflated."[37] Trustee also alleges that between March and July of 2017, "IDC was considered by many to be the market standard for pricing the kinds of illiquid securities at issue here, and Mirae could not have known that IDC had previously agreed to permit the Criminal Insiders to unilaterally set the bond prices."[38] Wedbush contends that there is

---

(citing D.I. 322 (Complaint by David W. Carickhoff, Jr. against Michael C. Hild) ¶¶ 115, 168). I have neither the relevant documents nor any legal analysis with which to make any conclusions on the nature of the relationship.

[35] *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001).

[36] Opening Br. at 14–15.

[37] Compl. ¶ 85.

[38] *Id.* ¶ 86.

no distinction between itself and Mirae, therefore, the face of the Complaint establishes its complete defense.[39]

Trustee counters that the allegations do not establish Defendant's good faith as a matter of law and therefore it is inappropriate to consider Defendant's good faith defense at the motion to dismiss stage.[40] While Trustee does not dispute that the payments to Wedbush were on account of an antecedent debt and therefore "for value," he argues that the referenced statements do not concede Wedbush's good faith. Trustee points to other statements, specific to Wedbush, in which he alleges facts showing Wedbush's lack of good faith by reason of its knowledge of the fraud and the fraudulent nature of the transfers. For example, Trustee alleges Wedbush became suspicious of the bond pricing and requested the names of other broker dealers to confirm the valuation prices provided by IDC. In addition, Wedbush became aware of the SEC investigation and began reducing its exposure to the bonds.[41]

While it is possible for a plaintiff to plead too much and thereby sabotage its suit at the motion to dismiss stage, reading the Complaint in its entirety, I do not find that to be the case here. The Complaint does not establish Defendant's good faith as a matter of law but leaves open factual issues to be developed and presented to the court. While Trustee's references to Mirae appear to be gratuitous, Trustee has alleged additional facts, not attributed to Mirae, which, if true, could undercut a § 548(c) defense.

---

[39] Reply Br. at 8.

[40] Answering Br. at 22.

[41] *Id.* at 22–23; Compl. ¶¶ 68–69; 72; 74; 89.

13

### c. *Diminution of the Estate*

Finally, Wedbush advances a new argument in its Reply Brief—that "the Complaint should also be dismissed because the Trustee admits in the [Answering Brief] that the Transfers did not diminish the Debtor's estate."[42] Specifically, Wedbush points to Trustee's statements in the Answering Brief that Live Well was "'able to secure enough credit to repurchase the last of the bonds from Wedbush' . . . and 'used new money to pay off old debt.'"[43] But, Wedbush also cites to the Complaint in support of this new argument.[44]

Initially, a reply brief "is not the appropriate time to raise a new argument."[45] Trustee's statements in the Answering Brief do not raise new issues or concede points not apparent from the face of the Complaint. But, even considering this new argument, I decline to dismiss the case at this stage. The cases Defendant cites discuss whether "diminution of the estate" is an implicit requirement of a claim for a fraudulent conveyance.[46] Each case is distinguishable. *Polichuk* is in the context of summary judgment and the court concludes that a transferee's "pre-petition transfer of the [debtor's property] back to the [d]ebtor provides a complete defense to the [t]rustee's fraudulent transfer claims

---

[42] Reply Br. at 10.

[43] *Id.*

[44] *Id.* at 20 (quoting Compl. ¶ 90) ("Live Well borrowed the funds necessary to repurchase these bonds from Wedbush from its other repo lenders, including Mirae").

[45] *Cohen v. Cohen*, C.A. No. 19-1219-MN, 2022 WL 952842, at *4 (D. Del. Mar. 30, 2022) (collecting cases); *Laborers' Intern. Union of N. Amer., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief").

[46] *See e.g., Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 192–94 (S.D.N.Y. 2002) (posing the question as whether the interest transferred would have been available to satisfy other creditors and noting courts on both sides of the question).

under 11 U.S.C. § 548(a)."[47] In *Ehrlich,* the district court affirms the bankruptcy court's dismissal of an actual fraudulent conveyance where the challenged transfer was a payment to a secured creditor out of the secured creditor's own cash collateral.[48] In *Bear, Stearns,* the district court dismisses claims where the transferee established (with evidence) that, as a matter of federal securities law, the transfer was not of "an interest of the debtor in property."[49]

Wedbush has failed to demonstrate its entitlement to this defense as a matter of law. Wedbush has not pointed to any allegations in the Complaint (or even in the Answering Brief) to show that it was repaid from its own collateral, that Live Well did not have an interest in the funds transferred or that Wedbush transferred funds back to Live Well prepetition. Rather, Live Well alleges that the funds paid to Wedbush were obtained by borrowing from "new victims" and increasing its credit lines with its "current victims."[50] At this stage of the case, I cannot conclude that the transfers to Wedbush did not diminish the estate.

Taking all facts in the Complaint as true and drawing all reasonable inferences in favor of Trustee, Trustee has stated a plausible claim that Live Well made the payments to Wedbush intending to prevent the discovery of and continue to perpetuate the fraudulent scheme. The Motion to Dismiss as to Count I is denied.

---

[47] *Finkel v. Polichuk (In re Polichuk),* 506 B.R. 405, 436 (Bankr. E.D. Pa. 2014).

[48] *Ehrlich for Hoffmans Trade v. Com. Factors,* 567 B.R. 684, 695 (N.D.N.Y. 2017).

[49] *Bear, Stearns Sec. Corp.,* 275 B.R. at 198.

[50] Compl. ¶ 10.

## II. Recovery of Avoidable Transfer

In Count II, Trustee seeks to recover the alleged fraudulent transfers pursuant to 11 U.S.C. § 550. Because the avoidance claim remains, the Motion to Dismiss as to Count II is denied.

**Conclusion**

For the reasons set forth above, the Motion to Dismiss is denied. An order will enter.

Dated: June 16, 2023

_____
Laurie Selber Silverstein
United States Bankruptcy Judge